IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARTIN MARTINEZ, JR.,

        Petitioner,

v.                                           CIV 10-0260 RB/KBM

CALVIN D. MORTON, Warden of
the Regional Correctional Center and,
TONY R. MIRABAL, as Lieutenant
Governor for Taos Pueblo,

        Respondents.

# <u>PROPOSED FINDINGS</u><br><u>AND</u><br><u>RECOMMENDED DISPOSITION</u>

Taos Pueblo Judge Charlene Tsoodle-Marcus found Petitioner Martin Martinez Jr. guilty of driving while intoxicated and sentenced him to one year imprisonment. Petitioner has counsel and has twice challenged his conviction under the Indian Civil Rights Act ("*ICRA*"), 25 U.S.C. § 1301 *et seq.* Counsel agreed to dismiss the first suit for failure to exhaust tribal remedies. *See Martinez v. Morton,* CIV 09-1164 JCH/DJS (Doc. 12). The instant matter was filed by Petitioner's attorney in March, and it is before me on the well-documented petition and answer, and reply. *See Docs. 1, 11, 13.* I recommend that the petition be dismissed.

# I.  Initial Considerations

### A.  Scope Of Section 1302 Guarantees And Habeas Review Under The ICRA

Historically, courts held that federal constitutional guarantees did not apply to tribes.

Congress enacted the ICRA in 1968, and Section 1302 provides that tribal governments cannot:

(1)  make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;

(2)  violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized;

(3)  subject any person for the same offense to be twice put in jeopardy;

(4)  compel any person in any criminal case to be a witness against himself;

(5)  take any private property for a public use without just compensation;

(6)  deny to any person in a criminal proceeding the right to a speedy and public trial, to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and at his own expense to have the assistance of counsel for his defense;

(7)  require excessive bail, impose excessive fines, inflict cruel and unusual punishments, and in no event impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of one year and* a fine of $5,000, or both;

(8)  deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law;

(9)  pass any bill of attainder or ex post facto law; or

(10)  deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons.

25 U.S.C. § 1302 (footnote at * questioning use of term "and" instead of "or" omitted).

The Section 1302 restrictions "are *similar, but not identical,* to those contained in the Bill of Rights and the Fourteenth Amendment." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 57 (1978) (emphasis added).[1]  For example, even though subsection eight contains a broad guarantee of "due process," a tribe is not required to provide appointed counsel for indigent defendants because subsection six only provides for counsel at a defendant's "own expense."[2] Likewise, aside from a limited exception, federal courts cannot hear suits that allege violations of § 1302 unless it sounds in habeas.  Habeas relief, in turn, is only permissible to challenge a tribal "detention" – "The privilege of the writ of habeas corpus shall be available to any person,

_____

[1]  *See also e.g., Means v. Navajo Nation,* 432 F.3d 924, 935 (9th Cir. 2005) ("the Indian Civil Rights Act confers all the criminal protections on Means that he would receive under the Federal Constitution, except for the right to grand jury indictment and the right to appointed counsel if he cannot afford an attorney"), *cert. denied,* 549 U.S. 952 (2006); *Poodry v. Tonawanda Band of Seneca Indians,* 85 F.3d 874, 882 (2nd Cir.) ("Among the most notable distinctions between § 1302 and cognate constitutional provisions, as interpreted, are the absence in the ICRA of a clause prohibiting the establishment of religion; the omission of a right to the assistance of counsel for the indigent accused; the absence of a right to a jury trial in civil cases; and the specific limitations on terms of imprisonment and fines."), *cert. denied,* 519 U.S. 1041 (1996).

[2]  *United States v. Benally,* 756 F.2d 773, 779 (10th Cir. 1985) ("After reviewing the language of the statute and its legislative history, the Ninth Circuit held in *Tom v. Sutton* . . . :  "Congress in enacting the Indian Bill of Rights did not intend to require the Indian tribal courts to provide counsel for indigent defendants in criminal cases.'  We agree.");  *see also e.g., Duro v. Reina,* 495 U.S. 676, 693 (1990) ("While modern tribal courts include many familiar features of the judicial process, they are influenced by the unique customs, languages, and usages of the tribes they serve.  Tribal courts are often 'subordinate to the political branches of tribal governments,' and their legal methods may depend on 'unspoken practices and norms.' . . .  It is significant that the Bill of Rights does not apply to Indian tribal governments. . . . [ICRA] provides some statutory guarantees of fair procedure, but these guarantees are not equivalent to their constitutional counterparts.  There is, for example, no right under the Act to appointed counsel for those unable to afford a lawyer.") (citations omitted), *superceded on other grounds by statute; United States v. Doherty,* 126 F.3d 769, 778-79 (6th Cir. 1997) ("ICRA  provides for a right to counsel, but does not extend that right to the limits of the Sixth Amendment. . . .  Thus, the tribes are not required to provide counsel to the indigent accused in felony prosecutions, despite the Sixth Amendment holding to the contrary in *Gideon*"), *cert. denied,* 524 U.S. 917 (1998), *abrogated on other grounds by Texas v. Cobb,* 532 U.S. 162 (2001); *United States v. Ant,* 882 F.2d 1389, 1392 (9th Cir. 1989) ("The Ninth Circuit has held that, the due process clause of the ICRA notwithstanding, 25 U.S.C. § 1302(8), there is no federal right to appointed counsel in tribal criminal proceedings.  *Tom v. Sutton,* 533 F.2d 1101 (9th Cir. 1976).  It is clear that in tribal court, [the defendant] was entitled to have an attorney at his own expense, but that he was not entitled to have a court-appointed attorney.").

in a court of the United States, to test the legality of his detention by order of an Indian tribe."

25 U.S.C. § 1303.[3]  Aside from the text of  §§ 1302 and 1303, the proper scope of federal habeas

review of tribal convictions is not entirely settled.  Defining that authority is key in this case

because Petitioner sometimes cites a federal ***constitutional*** principle as a basis for granting him

relief while ignoring a federal ***habeas*** principle that would preclude any relief.

Some federal decisions, including some from the Tenth Circuit, have expressly declined

to decide the general question whether an ICRA right and its federal constitutional counterpart

are identical.[4]  To resolve the issues in the instant petition, I need not address that issue and

---

[3]  As the Tenth Circuit reiterated in a fairly recent decision:

> Congress has waived tribal immunity under the ICRA solely for habeas corpus relief.  *Santa Clara Pueblo,* 436 U.S. at 60-61; *Ordinance 59 Ass'n v. United States Dept. of Interior Sec'y,* 163 F.3d 1150, 1154 (10th Cir. 1998).  Federal courts, therefore, lack subject matter jurisdiction to hear claims under the ICRA against Indian tribes for declaratory relief, *Ordinance 59 Ass'n,* 163 F.3d at 1153, or monetary damages, *Olguin v. Lucero,* 87 F.3d 401, 404 (10th Cir. 1996).  Further, in addition to the tribes themselves, this immunity from suit under the ICRA protects tribal officers acting in their official capacity.  *Santa Clara Pueblo,* 436 U.S. at 71-72; *Fletcher v. United States,* 116 F.3d 1315, 1324 (10th Cir. 1997) ("Tribal Defendants [are] entitled to sovereign immunity as far as the official capacity claims").  [and in footnote 1]  The ICRA, by its plain language, does not allow suits against individual Indians acting in a non-official capacity. . . . *Dry Creek Lodge, Inc. v. United States,* 515 F.2d 926, 935 (10th Cir. 1975) ("Section 1302 speaks only to tribe action, and it has been held that it does not give rise to jurisdiction under 28 U.S.C. § 1343 over individual tribal members.").  [Under] the limited exception announced in *Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes,* 623 F.2d 682, 685 (10th Cir. 1980) . . . plaintiff must demonstrate: the dispute involves a non-Indian party; a tribal forum is not available; and the dispute involves an issue falling outside internal tribal affairs."  *Ordinance 59 Ass'n,* 163 F.3d at 1156.

*Gallegos v. Jicarilla Apache Nation,* 97 Fed. App'x 806, 810 (10th Cir. 2003).

[4]  *See Harvey on Behalf of Chavez v. Star,* 1996 WL 511586 at * 1, n.2 (10th Cir. 1996) ("We need not and do not decide whether the ICRA's habeas provision would also support federal review of the tribal court's child custody order.  Such use of § 1303 raises unsettled questions regarding the statute's scope and purpose.") (citing *Poodry,* 85 F.3d at 891-92); *see also Poodry,* 85 F.3d at 893 & n.21 ("courts have not had occasion to fully consider the scope of § 1303, much less reach the conclusion pressed by the petitioners - that § 1303 was to serve as a broader basis of relief than cognate habeas provisions. [and in footnote]. . . . we do not express a view on whether the substantive provisions of § 1302 must also be

express no opinion on the subject.  On the other hand, other federal decisions, including those

from the Tenth Circuit, apply general habeas principles to a § 1303 petition, such as requiring

exhaustion of tribal remedies.  *See* discussion *infra* Part I.B.  The Tenth Circuit decisions do not

define the outer bounds of federal habeas review under § 1303, but other federal decisions follow

the portions of the Second Circuit's *Poodry* decision which indicated that the ICRA provides no

greater protection than other habeas cases.  With no binding precedent to the contrary, I find

persuasive the decisions that hold the scope of habeas review under § 1303 is no broader than

review under § 2254.[5]

## B.  Jurisdiction Under The ICRA

The "detention" language in § 1303 is analogous to the "custody" requirement contained

in the federal habeas statute."  *Walton v. Tesuque Pueblo,* 443 F.3d 1274, 1279, n.1 (10th Cir.),

---

treated as coextensive with analogous constitutional provisions.").

    [5] While *Poodry* expressly declined to address the issue of the scope of ICRA guarantees, *see supra* note 4, other portions of *Poodry* and the *Weatherwax* decision it relies on are the most frequently cited sources for the proposition that federal courts read § 1303 as coextensive with § 2254 habeas principles.  *See Poodry,* 85 F.3d at 891 (the "legislative history of the ICRA simply does not support the proposition that § 1303 was meant to be read more broadly than other habeas statutes"); *id.* at 892 ("Courts thus appear to look to the development of law under 28 U.S.C. § 2254 for guidance as to whether habeas relief is available in such matters under § 1303.") (quoting footnote in *Weatherwax on behalf of Carlson v. Fairbanks,* 619 F. Supp. 294, 296, n.2 (D. Mont. 1985) where it states:  "This court has consistently found the law which has developed with respect to actions for habeas corpus relief under 28 U.S.C. § 2254 to be applicable by analogy to actions founded upon 25 U.S.C. § 1303."); *see also e.g., Shenandoah v. United States Dept. of Interior,* 159 F.3d 708, 713-14 (2nd Cir. 1998) ("'[S]ection 1303 was intended by Congress to have no broader reach than the cognate statutory provisions governing collateral review of state and federal action,' [*Poodry*] at 901 (Jacobs, J., dissenting); *accord id.* at 879-80 (majority opinion)"); *Goslin v. Kickapoo Nation Dist. Court,* 1998 WL 1054223 at *4  (D. Kan. 1998) ("Section 1303 was not 'intended to have broader reach than cognate statutory provisions governing collateral review of state and federal action.'  *Poodry* . . . Federal courts do not have jurisdiction under 28 U.S.C. § 2254 to consider collateral challenges to state child-custody decisions. . . . To preserve the principles of federalism, federal courts lack § 2254 jurisdiction on challenges to state court orders affecting parental rights and child custody matters."); *Liska v. Macarro,* 2009 WL 2424293 at * 5 & n.8 (S.D. Cal. 2009) ("courts deciding § 1303 claims frequently draw on principles of analogous habeas statutes.") (citing *Poodry,* 85 F.2d at 891-92 and *Weatherwax,* 619 F. Supp. at  296).

*cert. denied,* 549 U.S. 1031 (2006); *see also Dry v. CFR Court of Indian Offenses for the Choctaw Nation,* 168 F.3d 1207, 1208 n. 1 (10th Cir.), *cert. denied,* 528 U.S. 815 (1999).  There is no dispute that Petitioner meets the detention requirement.  Indeed, both his conviction and sentence of incarceration and his actual incarceration suffice.  *E.g., Walton,* 443 F.3d at 1279 n. 2; *Dry,* 168 F.3d at 1208-09.  Exhaustion of tribal remedies is also a prerequisite to seeking relief in federal court, *e.g., Dry,* 168 F.3d at 1209, and all agree that Petitioner has "now exhausted all tribal remedies by which he could seek relief from his incarceration," *Doc. 11* at 2.[6]

### C.  Applicability Of Habeas Rules To The ICRA Petitions

When this Court ordered Respondents' answer, it cited Rules 1(b) and 4 of the Rules Governing Section 2254 Cases In the United States District Courts.  *Doc. 11* at 5; *see also e.g., Doc. 6* at 1.  Respondents thus urge this Court to apply other § 2254 habeas rules and dismiss the § 1303 petition.  Specifically, they ask this Court to find that petition is not in the proper format under Rule 2(d) because counsel did not use separately-numbered paragraphs like the form petition this Court makes available for § 2254 cases.  They also argue that the petition is not in the proper format under Rule 2(c)(5) because it was signed by counsel instead of by Petitioner. *See Doc. 11* at 3-6.

Respondents have not cited any decision that applies the formatting aspects of Rule 2 to a § 1303 petition.[7]  I decline to do so for several reasons.

---

[6]  *See also Doc. 1* at 5-6 ("to be absolutely sure that administrative remedies were exhausted . . . counsel . . . filed . . . with the  . . . Governor . . . Lt. Governor and  . . . Tribal Counsel"); *Doc. 11-1* at ¶ 15 (hereinafter "Tsoodle-Marcus Affidavit") ("Petitioner has now exhausted his tribal remedies as to the grounds argued in his Petition").

[7]  Subsection (a) and (b) of Rule 2 address who should be named as respondents in § 1303 cases and one court has incorporated those aspects of the rule.  *See Liska v. Macarro,* 2009 WL 2424293 at * 5 & n.8 (S.D. Cal. 2009) ("Federal courts lack personal jurisdiction when a habeas corpus petition fails to name a proper respondent, *see Ortiz-Sandoval v. Gomez,* 81 F.3d 891, 894 (9th Cir. 1996) (citing Rule

Foremost, application of one habeas rule does not automatically require application of the others.  *See* Rule 1(b), RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS ("[t]he district court *may apply any or all* of these rules to a habeas corpus petition not covered by [28 U.S.C. § 2254]") (emphasis added).  A Tenth Circuit decision not cited by Respondents observed that "Rule 2(d). . .  imposes no affirmative pleading requirements. . . . The requirement that a standard form be used is for the administrative convenience of the court and the parties."  *Kilgore v. Attorney General of Colorado,* 519 F.3d 1084, 1088 (10ᵗʰ Cir. 2008) (citing *Bundy v. Wainwright,* 808 F.2d 1410, 1414 (11ᵗʰ  Cir. 1987) where it stated:  "Petitioner is not required by statute or Rules to attach to his petition or to file a state court record in order to avoid a dismissal for facial insufficiency").

Also, Rule 2(d) simply requires that a habeas petition "substantially follow" either the form attached to the habeas rules or a "form prescribed by a local district-court rule."  This District does provide easy-to-fill forms for prisoners who are pursuing Section 2254, 2255, or 2241 relief , but I am unaware of any standing order that mandates the forms be used.  If a *pro se* prisoner's submission is undecipherable, the Court can require the use of a form because it helps direct the *pro se* litigant to provide the Court with the appropriate information.  But that is not necessary with attorney-drafted petitions, and certainly not the case here.  The § 1303 petition here:  contains a caption; identifies the conviction at issue; provides a detailed statement of background facts; is divided into clear sections that delineate jurisdiction, exhaustion, and relief requested; lists separately-numbered claims in the argument section; cites authorities throughout;

2(a) . . . )" and, in footnote, "Although there is no case holding that failure to name the proper respondent in a § 1303 habeas corpus petition defeats personal jurisdiction, the Court finds this rule is nonetheless applicable because courts deciding § 1303 claims frequently draw on principles of analogous habeas statutes." (citing *Poodry,* 85 F.2d at 891-92 and *Weatherwax,* 619 F. Supp. at  296)).

and provides exhibits.  In short, it contains everything necessary to understand the basis for jurisdiction, and claims and relief sought.

Respondent's citation to FED. R. CIV. P. 10 for the proposition that each paragraph in the petition must be separately-numbered borders on the frivolous.  It is obvious that Respondents' counsel is able to understand what the petition claims and respond to it without the help of paragraph numbers.  Indeed, the very habeas rules Respondents want the Court to apply provide that application of federal civil rules is discretionary and not mandatory – "The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory provisions under these rules, **may** be applied to a proceeding under these rules."  Rule 12, RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS (emphasis added).  Respondents have not cited, nor have I found a single decision that applies Rule 10 to a habeas case of any sort, much less to a § 1303 petition.  Thus, I reject the Rule 2(d) argument.

Habeas Rule 2(c)(5) stands in a slightly different posture because it refers to a federal statute.  The rule provides that the "petition must . . . be signed under penalty of perjury by the petitioner or by a person authorized to sign it for the petitioner under 28 U.S.C. § 2242."  Rule 2(c)(5), RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS.  The statute provides that an "[a]pplication for a writ of habeas corpus shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf."  28 U.S.C. § 2242.  It makes no distinction between types of habeas cases.

Historically, the "other person" portion of § 2242 has been interpreted as individuals who file as "next friends" of a habeas petitioner.[8]  Respondents contend that if a petitioner does not

---

[8]  *See e.g., Whitmore v. Arkansas,* 495 U.S. 149, 162-63 (1990) ("Some early decisions in this country interpreted ambiguous provisions of the federal habeas corpus statute to allow "next friend"

personally sign a § 1303 petition under penalty of perjury, then his or her attorney must either

sign the petition under penalty of perjury or submit it with the sworn affidavit executed by the

attorney.  In support, they refer to how one attorney presented a § 1303 petition in another case.

*See Doc. 11* at 3.  While I believe that the better practice is to have the client execute the

petition, I decline to impose such a requirement here, particularly at this juncture.

In some circuits, the Rule 2 signature requirement is not jurisdictional and an attorney

signature for a known petitioner creates a "presumption of authorization" for § 2242 purposes.[9]

In contrast, for unidentified petitioners the attorney must actively demonstrate that he or she

meets the criteria to qualify as a "next friend" under the statute.  *See Does v. Bush,* 2006 WL

3096685 at ** 4-5(D.D.C. 2006) ("*Lucky* does not support Counsel's claim that Counsel can

proceed without consent from the unidentified detainees Counsel purports to represent in this

case.).  The parties have not cited, nor have I found a decision in the Tenth Circuit that takes a

position either way.  Nevertheless, it appears that when an attorney fails to comply with the

verification requirement, dismissal is not mandated.

---

standing in connection with petitions for writs of habeas corpus . . . and Congress eventually codified the doctrine explicitly in 1948.  *See* 28 U.S.C. § 2242.").

[9]  The Ninth Circuit's decision in *Lucky* sets forth the "presumption" rationale.

A federal habeas petition can be signed and verified by "someone acting in [the petitioner's] behalf."  28 U.S.C. § 2242; see also Advisory Committee Note on Rule 2(c) ("As required by 28 U.S.C. § 2242, the petition must be signed and sworn to by the petitioner ( or someone acting in his behalf )") (emphasis added).  Thus, a habeas petitioner's attorney can sign and verify the petition for the petitioner.  In the absence of evidence to the contrary, there is a presumption that a petitioner has been fully informed of, and has consented to, claims raised in the petition.  *Deutscher v. Angelone,* 16 F.3d 981, 984 (9th Cir. 1994).

*Lucky v. Calderon,* 86 F.3d 923, 925 (9th Cir. 1996); *see also e.g., Morris v. Hudson,* 2007 WL 4276665 at * 9 (N.D. Ohio 2007) (and cases cited therein).

> In its return to Hem's habeas corpus petition, the Government asked that the petition be dismissed because only Hem's counsel signed the petition. *See* 28 U.S.C. § 2242 (an application for a writ of habeas corpus "shall be in writing signed and verified by the person for whose relief it is intended or by someone acting in his behalf"). We are not obligated, however, to dismiss the petition, and decline to do so. *See Hendricks v. Vasquez,* 908 F.2d 490, 491 (9th Cir. 1990) ("the defect [of an unverified petition] is one that the district court may, if it sees fit, disregard.").

*Hem v. Maurer,* 458 F.3d 1185, 1201, n.6  (10th Cir. 2006).

Also, I agree with Respondents that an expedited disposition is appropriate. This is the second  federal action Petitioner's attorneys have pursued. And, despite what they perceive as format deficiencies, Respondents have comprehensively addressed the substance of the claims and attached materials that constitute the "record proper" of the tribal proceedings to their answer "to expedite disposition of this matter." *See Doc. 11* a 6; *see also id.* at 7-32; *Docs. 11-1 - 11-11.* At this point, Petitioner has already served a significant portion of a relatively short sentence, and he was due to have the tribal judge again revisit whether to continue his incarceration in June or July of this year.

In the end, the dispute over verification is really about whether there are two sets of factual issues that will require an evidentiary hearing. The first set of factual issues pertains to whether or not Petitioner's attorneys will verify under penalty of perjury that they listened to the audio tapes of the tribal proceedings before filing the § 1303 petition. Evidently no attorney for Petitioner is willing to do so, given that facts in Petitioner's reply are raised by way of footnote, rather than properly supported by an affidavit or document. The footnote, however, indicates that Mr. Shannon is willing to testify at a federal evidentiary hearing. *See Doc. 13* at 6-7, n. 3; *see also supra* note 18. The second set of factual issues pertains to the three sworn affidavits Ms. Alderman attached to the § 1303 petition – one from each of Petitioner's parents, and the

other from a tribal member.  These affidavits figure prominently in the Petitioner's claims that

he was not afforded a "public trial" and that the Pueblo's recitation of the right to a jury trial is

illusory.  *See Doc. 1* at 6-8; *id.* at 13-16; *Docs. 1-2, 1-3, 1-17.*  Having reviewed Counsels'

submissions and the record proper in detail, I explain below why the factual disputes are either

not material or do not implicate a cognizable habeas claim.

### D.  Scope Of Habeas Relief Under The ICRA

With no citation to authority, Petitioner states that immediate release "is, in fact, the only

remedy which can be provided by the federal court pursuant to the Indian Civil Rights Act."

*Doc. 1* at 17; *see also id.* at 19.  He maintains that only immediate release can serve as the

appropriate remedy regardless of the nature of the alleged violation, and his allegations range

from denial of trial-type rights, to failure to provide Petitioner's attorney with copies of trial

materials, to violations of tribal rules of procedure.[10]  I disagree.

First, the statute itself says nothing about the appropriate relief much less restrictions on

the relief this Court may grant.  Section 1301 defines statutory terms but says nothing about

relief.  Section 1302, quoted above, enumerates the rights protected by ICRA.  Section 1303,

also quoted above, simply provides that a writ of habeas corpus can issue and says nothing about

the scope of that relief.

More importantly, the cases Petitioner cites do not support the proposition that release is

---

[10]  *See Doc. 1* at 9 (for violation of right to public trial - "grant this petition for writ of habeas corpus and to order his release"); *id.* at 11 (for violation of confrontation clause rights - same); *id.* at 13 (for violation of right not to be compelled as a witness against himself - same); *id.* at 16 (for violation of right to a jury trial - same); *id.* at 17 (for failing to provide postconviction counsel with materials - same); *id.* at 18 (violation of Taos Pueblo Tribal Court local rule that requires tribal judges be licensed member of the New Mexico Bar - "habeas relief be granted and that his immediate release be ordered"); *id.* at 19 (title to section on demand for relief -"appropriate and only remedy . . . is to order his immediate release").

the sole appropriate relief.[11]  Quite the opposite – those that mention what the remedy entailed

stand for the proposition that a conditional writ is the appropriate relief.[12]

   It is true that federal courts have the broad statutory authority to "dispose of the [habeas]

---

[11] *In re Oliver,* 333 U.S. 257 (1948) (cited at page 9, 12 of the petition) and *Lewis v. Peyton,* 352 F.2d 791 (4th Cir. 1965) (cited at page 8 of the petition) do not discuss the nature of the habeas relief granted and left it for the lower court to decide.  *See Oliver,* 333 U.S. at 278 ("The judgment of the Supreme Court of Michigan is reversed and the cause is remanded to it for disposition not inconsistent with this opinion."); *Lewis,* 352 F.2d at 792  (The order of the district court [denying habeas relief] is reversed and the matter remanded for entry of an order compatible with this opinion.").  Neither case shows any subsequent history available on Westlaw.  In *Payer v. Turtle Mountain Tribal Council,* 2003 WL 22339181 (D. N.D. 2003) (at page 19 of the petition)  the court dismissed the action "styled as a request for habeas corpus relief" because it lacked  "jurisdiction over this matter as the Petitioners have not satisfied the detention requirement."  *Id.* at * 6.  The opinion also noted that only property rights were at issue, and the Supreme Court's decision in "*Santa Clara Pueblo v. Martinez* reduces the degree of federal interference in tribal government and requires that enforcement of the Indian Civil Rights Act rest primarily in the Tribal Courts."  *Id.*

[12] *Burbank v. Cain,* 535 F.3d 350, 359 (5th Cir. 2008) (cited at page 11 of the petition) did affirm the district court's grant of habeas relief for a Confrontation Clause violation, *id.* at 359, but the relief granted by the district court was conditional – if the state did not retry the petitioner, the federal court would order dismissal of the charges.  *See Burbank v. Cain,* 2007 WL 2480319 at * 11 (E.D. La. 2007) ("The petition of TONY BURBANK for writ of habeas corpus under 28 U.S.C. § 2254 is GRANTED. Accordingly, IT IS ORDERED that the conviction and sentence of TONY BURBANK be and hereby are set aside. It is FURTHER ORDERED that the state either retry TONY BURBANK within 120 days of this order or dismiss the charges. The state shall notify the defense and the Court of its intention within 30 days of this ruling. Judgment will be entered accordingly."); *see also Burbank v. Cain,* 2007 WL 2809996 (E.D. La. 2007) (same relief granted reiterated in denying stay pending appeal).

   *Fratta v. Quarterman,* 536 F.3d 485 (5th Cir. 2008)  (cited at page 11 of the petition) also affirmed a conditional grant of relief.  *See id.* at 511 ("the district court was correct in concluding that Fratta is entitled to habeas relief based on the Confrontation Clause violations that occurred at his trial. The judgment of the district court conditionally granting habeas relief on these claims is therefore AFFIRMED."); *see also Fratta v. Quarterman,* 2007 WL 2872698 at * 25 (S.D. Tex. 2007) (relief was "provisionally GRANTED with respect to his claims involving his confession and the hearsay testimony given at trial. . . .  Respondent . . . shall release Petitioner . . . from custody unless within 180 days the State of Texas institutes new criminal proceedings against him.  The 180-day time period shall not commence until the conclusion of any appeal from this Order, either by the exhaustion of appellate remedies or the expiration of the time period in which to file such appellate proceedings.").

   In *Teel v. Burton,* 904 F. Supp. 1294 (M.D. Ala. 1995) (cited at page 11 of the petition), the court granted conditional relief.  *Id*. at 1303 ("That the petition for writ of habeas corpus filed by petitioner Paul Edward Teel is granted to the extent that, unless within 90 days from the date of this order the State of Alabama commences a new trial of petitioner Teel, a writ of habeas corpus shall issue.").

matter as law and justice require."  28 U.S.C. § 2243.  However, federal courts will tailor the

habeas relief so that it specifically remedies the constitutional violation at issue.  Before federal

courts will order release, they generally give the sovereign that secured the conviction an

opportunity to retry the defendant.  Not only is "[a]llowing 120 days for a retrial . . . a common

practice,"[13] it is a long-settled and Supreme-Court-approved remedy that serves the important

comity concerns underlying federal habeas proceedings.[14]

> District courts generally favor conditional grants of the writ of habeas corpus because they give the state "an opportunity to cure its constitutional errors" and "maintain comity among co-equal sovereigns." . . .  "[C]ourts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court." . . .  As the Seventh Circuit has noted, "[c]onditional orders are essentially accommodations accorded to the state.  They represent a district court's holding that a constitutional infirmity justifies petitioner's release.  The conditional nature of the order provides the state with a window of time within which it might cure the constitutional error." . . .

> "[T]he sole distinction between a conditional grant and an absolute grant of the writ of habeas corpus is that the former lies latent unless and until the state

---

[13]  *Wansing v. Hargett,* 115 Fed. App'x 27, 30 -31 (10th Cir. 2004) (citing *Holloway v. Horn,* 355 F.3d 707, 730 (3rd Cir.), *cert. denied,* 543 U.S. 976 (2004), and *Soffar v. Dretke,* 368 F.3d 441, 480 (5th Cir. 2004), and *Foster v. Lockhart,* 9 F.3d 722, 727 (8th Cir. 1993)), *cert denied,* 544 U.S. 1020 (2005); *see also Douglas v. Workman,* 560 F.3d 1156, 1176 (10th Cir. 2009) ("A federal writ of habeas corpus 'does not generally bar a retrial of the petitioner on the charges underlying his defective conviction.' *Capps v. Sullivan,* 13 F.3d 350, 352 (10th Cir. 1993).  'In fact, rather than barring a new trial, the district court normally should facilitate it by suspending the writ for a time reasonably calculated to provide the state an adequate opportunity to conduct the new trial.' *Id.*").

[14]  For example, citing cases dating back to the 1890's, the Supreme Court noted that it "has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court." *Hilton v. Braunskill,* 481 U.S. 770, 774-75  (1987) (citing as examples, *Rogers v. Richmond,* 365 U.S. 534, 549 (1961); *Dowd v. United States ex rel. Cook,* 340 U.S. 206, 210 (1951); *In re Bonner,* 151 U.S. 242, 261-62 (1894)).  Later, the Supreme Court observed that "Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests," and that "[n]one of these deprivations, however, resulted in the dismissal of the indictment . . . the conviction in each case was reversed and the Government was free to proceed with a new trial." *United States v. Morrison,* 449 U.S. 361, 364-65 (1981).

fails to perform the established condition, at which time the writ springs to life."
. . . When the state fails to comply with the order's conditions, "[a] conditional
grant of a writ of habeas corpus requires the petitioner's release from custody." . .
. *accord* . . . (Scalia, J., concurring) ("Conditional writs enable habeas courts to
gives States time to replace an invalid judgment with a valid one, and the
consequence when they fail to do so is always release.").

*Scott v. Michigan State,* 2009 WL 4981687 at * 2 (6th Cir. 2009).[15]

Well-established habeas comity principles require federal habeas courts to give due

deference to the sovereign whose conviction is at issue. Those principles are no less compelling

with tribal criminal proceedings.[16] Given that the federal courts have not found § 1303 habeas

authority to exceed that provided in other habeas areas, I reject the argument that immediate

unconditional relief is the sole appropriate habeas relief under § 1303. That is so particularly,

where as here, the bulk of the cognizable claims concern trial practices. Thus, if Petitioner were

---

[15]   The above quotation omits internal citations to *Hilton,* 481 U.S. at 775; *Wilkinson v. Dotson,*
544 U.S. 74, 87 (2005) (Scalia, J., concurring); *Gentry v. Death,* 456 F.3d 687, 692 (6th Cir.), *cert. denied,*
549 U.S. 1097 (2006); *Satterlee v. Wolfenbarger,* 453 F.3d 362 (6th Cir. 2006), *cert. denied,* 549 U.S.
1281 (2007); *Phifer v. Warden,* 53 F.3d 859, 864-65 (7th Cir. 1995); *Fisher v. Rose,* 757 F.2d 789, 791
(6th Cir. 1985); and *McKitrick v. Jeffreys,* 255 Fed. App'x 74, 75-76 (6th Cir. 2007).

[16]   As Judge Black discussed in a recent opinion, the trial-type rights guaranteed under Sections
1302(4), (6), and (8)

> are designed to limit tribal government and it is therefore appropriate that tribal courts
> interpret their application to tribal proceedings. "Tribal courts play a vital role in tribal
> self-government, and respect for that role requires, as a matter of comity, that
> examination of issues of tribal sovereignty and jurisdiction be conducted in the first
> instance by the tribal court itself.". . . A "federal court should not entertain a challenge to
> the jurisdiction of a tribal court until after a petitioner has exhausted the remedies
> available in tribal court."

*Acosta-Vigil v. Delorme-Gaines,* 672 F. Supp. 2d 1194, 1196 (D.N.M. 2009) (citations omitted); *see also
e.g., Santa Clara Pueblo,* 436 U.S. at 66-67 ("Congress' provision for habeas corpus relief, and nothing
more, reflected a considered accommodation of the competing goals of 'preventing injustices perpetrated
by tribal governments, on the one hand, and, on the other, avoiding undue or precipitous interference in
the affairs of the Indian people.' . . . In settling on habeas corpus as the exclusive means for federal-court
review of tribal criminal proceedings, Congress opted for a less intrusive review mechanism than had
been initially proposed. Originally, the legislation would have authorized *de novo* review in federal court
of all convictions obtained in tribal courts.").

to prevail, he should be given a conditional grant of relief only, with this Court providing the tribe the opportunity to retry him on the criminal charges.  Since that is not the relief Petitioner is interested in securing, his petition could be dismissed on this basis alone.  Alternatively, for the reasons below, his claims are also not cognizable and/or without merit.

## II.  Factual & Procedural Background

### A.  The Arrest and Officer Vasquez's "Statement of Probable Cause"

In the fifteen months preceding his arrest while he was in his late twenties, Petitioner had several contacts with state and tribal criminal courts.  In late June 2009, Petitioner received a deferred sentence on a tribal conviction for alcohol-related offenses, and was placed on "ankle bracelet monitoring" so that he could continue with his classes at the University of New Mexico-Taos.  *See Doc. 11* at 8; *Doc. 11-2* at 30; *Doc. 11-3* at 18-22.  Within a few days – July 4, 2009 – Taos Pueblo Police Officer Robert Vasquez arrested Petitioner for driving while intoxicated.  As related in his "statement of probable cause," Officer Vasquez responded to a dispatch that a fast-moving automobile was involved in an accident, had extricated itself from where it was stuck, and was headed toward the Taos Pueblo area.  He spotted a vehicle with a flat tire and made a traffic stop.  A license plate check revealed that the vehicle was registered to Petitioner's father.  In addition to the flat tire, the car was badly damaged.  For example, Officer Vasquez observed Petitioner "attempting to get out of the driver side door which . . . would not open."  *Doc. 11-3* at 34.

Officer Vasquez asked Petitioner about the extensive damage to the car and told Petitioner that he "could smell some alcohol on [Petitioner's] breath."  *Id.*  Because Petitioner "did admit of consuming alcohol," Officer Vasquez  "contacted Taos Pueblo Dispatch and

requested assistance from the Taos Pueblo Tribal Sheriffs." *Id.* Because Petitioner was complaining of back pain, Officer Vasquez did not conduct a field sobriety test. *Id.* He did, however, ask several times if Petitioner was willing to take a breathalyser test. Petitioner initially refused to respond to the requests at all, and later affirmatively declined to take the test. *Id.* at 34-35. Meanwhile, Petitioner's father "arrived on the scene" and Officer Vasquez overheard the him ask Petitioner if "he had been drinking alcohol," to which Petitioner "said yes a few." *Id.* at 35.

Petitioner was taken to the police station, where he was "advised . . . of his *Miranda* Rights and the New Mexico Implied Consent [law]" and then taken to the hospital so he could be seen by a doctor. *Id.* Evidently no blood alcohol tests were performed there. Thus, with physical evidence of Petitioner's intoxication level, the three critical witnesses on the subject were Petitioner, Officer Vasquez, and Petitioner's father.

### B. The Arraignment

The tribe cannot locate the tape of Petitioner's arraignment. *See Tsoodle-Marcus Affidavit,* ¶¶ 14, 27. According to the not guilty plea he signed on July 7, 2009, Petitioner was:

provided a copy of the DEFENDANT'S RIGHTS; explanation of pleas; and the following rights were advised to [him]:

1. The right to have legal counsel throughout these proceedings, at the Defendant's own expense.
2. The right to consult legal counsel prior to entry of plea, on a continuance granted by the Court.
3. The right to have a copy of the Criminal Complaint filed against the Defendant.

UPON THE ENTRY OF A <u>NOT GUILTY PLEA</u>:

1. Entitled to be released on bail or under conditions of release determined by the Court prior to trial.
2. The right to a speedy and public or jury trial.
3. The right to cross-examine and ask questions of any witnesses who are required

to appear and testify against the Defendant.

4. The right to have witnesses subpoenaed in the Defendant's own behalf to appear and testify at trial.

5. The right to testify a (sic) trial or to remain silent, Defendant cannot be compelled to testify under the privilege against self incrimination.

*Doc. 11-3* at 31 (emphasis original).

The record also contains a "criminal complaint" charging Petitioner with one count of "Driving While Intoxicated" and Officer Vasquez's "statement of probable cause." Both documents bear the same caption and case number as the plea form Petitioner signed, and are file stamped as of the day before the arraignment. *Id.* at 33-35. Based on his statement during trial, there is no dispute that Petitioner was familiar with the contents of Officer Vasquez's written statement. *See Doc. 11-7* at 5, 7 (Petitioner did not contradict Judge's assertion that Petitioner was given a copy of the statement of probable cause "that night" and later during trial Petitioner stated: "I know it says that in the police report, but Your Honor . . ."). Petitioner was released on bond, presumably right after processing following his arraignment. *Doc. 11-3* at 32.

The parties dispute what Judge Tsoodle-Marcus told Petitioner's parents at the arraignment. According to the tribal judge, as "per [her] usual practice in a non-juvenile case," she advised them that "they would not be allowed to address the Court on behalf of their son, since he was an adult, not a minor." *Tsoodle-Marcus Affidavit, Doc. 11-1*, Exh. 1 at ¶ 29. She avows that she did not "tell Petitioner or his parents at that arraignment that they could not attend further criminal proceedings or the trial in that case," and that the parents "did remain for the arraignment." *Id.* at ¶ 29-30. The affidavits of Petitioner's parents, which are identical in pertinent part, make it plain that they initially attended their "son's arraignment." But they assert that Judge Tsoodle-Marcus told them they "would not be allowed to attend the proceedings against [Petitioner] . . . because he was over twenty one." *Doc. 1-2* at ¶¶ 3-5

(hereinafter "*Father's Affidavit*"); *Doc. 1-3* at ¶¶ 3-5 (hereinafter "*Mother's Affidavit*").  The

parents' other assertions infer that because of what Judge Tsoodle-Marcus told them during

arraignment, they left that hearing, and when the trial commenced some four months later,

Petitioner's father waited outside in his car:

> 3.  I went with my wife Marie Martinez, to my son's arraignment on July 7, 2009.
> 4.  Judge Tsoodle-Marcus told my wife and I that we would not be allowed to attend the proceedings against my son.
> 5.  The Judge said that this was because he was over twenty one (21), and did not give any other reason.
> 6.  Accordingly, my wife and I had to wait outside the courthouse during my son's arraignment on July 7, 2009.
> 7.  When the trial date came, I went with my son again, but since the Judge had already said I was not allowed in, I waited in the car outside the Tribal Court.

*Father's Affidavit,* ¶¶ 3-7; *see also Mother's Affidavit,* ¶¶ 3-6 ("I went with my husband and my

son to my son's arraignment on July 7, 2009. . . .  Judge  Tsoodle-Marcus told my husband and I

that we would not be allowed to attend the proceedings against my son. . . .  The Judge said that

this was because he was over twenty one (21), and did not give any other reason. . . .

Accordingly, my husband and I had to wait outside the courthouse during my son's arraignment

on July 7, 2009.") (paragraph numbers omitted).

### C.  The November 10, 2009 Trial

The guilt phase of the November 10, 2009 trial was taped and transcribed.[17]  Although

the Father's affidavit states that he did not testify at trial, it also specifically states that he was

"not subpoenaed . .  or asked" to testify.  *Father's Affidavit,* ¶¶ 3-7.  Significantly, he does not

---

[17]  Although the tape recording itself may have been difficult to understand, the electronic version
of the audio provided to this Court was easily understood.  *See Tsoodle-Marcus Affidavit,* ¶ 13.  Having
listened to the tape and compared it with the unofficial transcript also provided, I find that there is no
material difference between the audio version and the transcript.  *See Doc. 11-7.*

avow that he wanted to testify or that his son did not make the comment that Officer Vasquez

overheard.  And, it is plain from the transcript why neither Petitioner nor Officer Vasquez had

asked Petitioner's father to testify.

At the outset of trial, Officer Vasquez told Judge Tsoodle-Marcus that when he "spoke

with" Petitioner prior to trial, Petitioner said "he had . . . submitted or told your court clerk

Cecily that he was changing his pleading."  *Doc. 11-7* at 1.  But when they arrived at the

courthouse on the trial date, it turned out that "there was no proper forms completed."  *Id.*  The

judge responded that she had not been informed Petitioner wanted to change his plea and since

she did not "have any pleadings, request to change of plea or anything like this" she asked

Petitioner if he was "still wishing to change your plea or are you wishing to go through the bench

trial?"  *Id.*  The following colloquy ensued:

> MM [Petitioner]:  Your Honor, *if we go through the bench trial or not, is that*
> *happening today?*
> Judge:        Yeah, right now.
> MM:           Right now.
> Judge:        We are ready for a bench trial because I didn't know that you had – that
>                you were wanting to change your plea.
> MM:           *I guess – I guess we could just go on with the bench trial.*
> Judge:        Okay.  Go ahead.
> Vasquez:      Okay, Your Honor –
> Judge:        Introductory remarks.
> Vasquez:      On behalf of Taos Pueblo, I charge the Defendant, Mr. Martin Martinez
>                who is present in this Court today.  He is there wearing blue jeans and a
>                white shirt and [I] charge[d] him with a misdemeanor of Driving While
>                Intoxicated under § 5-3-3- of Taos Pueblo Law and Order Code.
> Judge:        Okay.  And, what do you want the Court to do?
> Vasquez:      I want the Court to hear, hear my case and make a decision about the
>                defendant depending on the hearing.
> Judge:        Okay.  Martin Martinez?
> MM:           Your Honor, want do you want?
> Judge:        Yeah, just the facts and *what you want the Court to do today.*
> MM:           Your Honor, as – *what I would like the Court to do today is, ah, since he*
>                *has no witness – for the charges to be dropped.*

*Id.* at 2 (emphasis added).

Nowhere in the trial transcript or his petition does Petitioner disagree that he originally intended to change his plea to guilty.  Indeed, he came to trial with a "certificate of completion" for his attendance at an alcohol-recovery program and with a negative "drug screening test" taken just hours before trial.  *Id.* at 7; *see also Doc. 11-3* at 24 (certificate dated 10/29/09 and file-stamped 11/10/09); *id.* at 25-26 ("rapid drug test screening" results from the Taos Pueblo Recovery Program dated and file-stamped 11/10/09).  Furthermore, his *pro se* letter addressed to Judge Tsoodle-Marcus dated ***two days after trial*** further reveals that, like his prior sentence, he hoped to be placed on ankle monitoring.  *Doc. 11-3* at 20.  In it, he does not deny his guilt. Instead, he "fully accept[s] the responsibility of the consequences for my actions concerning this matter."  *Id.*  Petitioner further asks the Judge reconsider his sentence to allow him to remain on ankle monitoring because:  he had previously followed all terms and condition for ankle monitoring;  his schooling and grant would be interrupted such that he would have to pay back the monies he had received for the semester; and he would not be able to attend spring "traditional ceremonies."  *Id.* at 21.

Thus, the excerpt above reveals that Petition came to the courthouse prepared to enter a guilty plea and ask for leniency.  When Petitioner realized his change of plea had not been entered, he seized on his perceived lack of prosecution witnesses as a basis to argue for an outright dismissal of the charges.  He did not request an attorney or a jury trial, ask for more time to prepare for trial, or ask that his father be called as a witness.

Under oath, Officer Vasquez gave his rendition of the facts, which was generally consistent with his "statement of probable cause."  *See Doc. 11-7* at 1-4.  After he neglected to mention overhearing Petitioner's statement to his father, Judge Tsoodle-Marcus prompted him by asking

"one more question. When your were in the presence of Martin Senior when you arrived at the scene, what went on?" *Id.* at 4. The officer replied that Petitioner "himself admitted to his father that he had consumed alcohol." *Id.* Unsolicited, Officer Vasquez then added that Petitioner "admitted to the Sheriffs and admitted to Veronica the dispatcher" that he had been drinking. *Id.*

In response to the Officer's testimony, Petitioner relied on the absence of other prosecution witnesses and argued that it would have been foolish for him to admit drinking while he was on probation and tethered to an ankle bracelet:

MM: Your Honor, I don't know the exact date, I think it was July 4th, July 4th, 2009, I was traveling and I must have over-corrected my vehicle. I then hit the side of the vehicle, busted a tire and ah, at the time I didn't have no jack to fix the tire, so I decided I could just drive to my Auntie's house where I can park it and come back the next day to fix the tire. *I did not tell my father that I was consuming alcohol. I didn't ah – tell the Sheriffs, I didn't tell Veronica the dispatcher. I believe I don't – I didn't tell nobody that I was consuming alcohol. You can see he has none of those witnesses saying that I did.* . . .

Judge: Okay. In the statement of probable cause – were you finished?

Vasquez: Okay, I don't have any further questions, Your Honor.

Judge: Okay. Do you have any further questions? [No response from Petitioner]. Okay, now I am going to go to the sentencing part. On the statement of probable cause it does say in here . . . that you were told by the officer that he smelled some alcohol on your breath and you did admit consuming alcohol. . . . and then it says over her it says Martin Senior arrived on the scene and I turned the vehicle to his custody and also in my presence his father asked him if he had been drinking alcohol and he said, 'yes, a few." . . . So, how do you respond to that?

MM: Your Honor, *I do not remember admitting to the officer I did that. The reasons why is because I was under probation, Your Honor . . . there was no proof taken that I was drinking. Just like I said, he has no witnesses saying I was drinking. That's what I know."*

*Id.* at 4-5 (emphasis added).

### D. Postconviction Proceedings

The Taos Pueblo court system has two types of courts – a "Modern Court" and a "Traditional Tribal Court." Judge Tsoodle-Marcus is a judge of the "Modern Court." Appeals

from her court lie with the Pueblo Lieutenant Governor, who serves as the Chief Judge of the "Traditional Court."  Tribal "habeas relief" can be pursued in either forum.[18]  According to the record, Petitioner pursued two rounds of "postconviction" proceedings – one in each forum.

The first was in the nature of a direct appeal to the "Traditional Court."  After his sentence was announced at trial, Petitioner submitted the *pro se* letter mentioned above, along with a letter of support from one of his UNM professors.  Both are dated November 12, 2009 – two days after trial – and they were filed on November 13, 2009 according to a file-stamp entitled "Tribal Court," which does not designate between "Modern" or "Traditional."  *See Doc. 11-3* at 21-22. According to an order Judge Tsoodle-Marcus later entered, Petitioner took an "appeal" to the "Traditional Court of Taos Pueblo" and that appeal "took place on the evening of Friday, November 13, 2009."  *Doc. 1-1* at 2.  The results of that "appeal" are not discussed by the parties, but I note that the "Jail Commitment Order" Judge Tsoodle-Marcus signed on November 12, 2009, was signed by both the "Lt. Governor, Traditional Ct. Judge" and the "Detention Officer" on November 13, 2009.  *Doc. 1-6* at 3.

The second round was in the nature of tribal habeas proceedings and was initiated in the Modern Court on November 16, 2009, when Petitioner executed a hand-written affidavit that is identical to his earlier *pro se* letter.  He filed it that same day along with the original professor's letter and another professor's e-mail.  *See Doc. 11-3* at 16-19.  On November 17, 2009, counsel

---

[18]  *See  Doc. 1* at 5-6 ("there is no appellate court associated with the Taos Pueblo Tribal Court [but] the Governor of the Taos Pueblo has exclusive jurisdiction over this matter on Taos Pueblo [and] the Lieutenant Governor of the Taos Pueblo is the Chief Judge of the Taos Pueblo Tribal Court [so] to be absolutely sure that administrative remedies were exhausted . . . counsel . . . filed . . . with the  . . . Governor . . . Lt. Governor and  . . . Tribal Counsel");  *see also Tsoodle-Marcus Affidavit,* ¶ 8 ("it is the Lt. Governor's office . .  to which appeals from the . . . Modern Court may be taken" and habeas petitions "may be addressed either to a judge of [the Modern] Court or to the Lt. Governor in his traditional capacity.").

signed and filed a document that:  (1) made an entry of appearance on behalf of Petitioner; (2)

demanded "timely" unspecified discovery, as well as preservation of a list of items including "all

written reports . . . audiotapes . . .  bodily fluids . . . tests . . . which might have a bearing on

defendant's guilt or innocence . . . witnesses statements;" and (3) demanded "a jury trial

guaranteed by . . . § 1302(10) and *Red Elk v. Silk,* 10 ILR 3110 (Dist. Montana 1983) which held

that the incarceration of an Indian defendant violated . . . § 1302(10) when a jury trial was not

provided to the defendant."  *Doc. 1-8* at 1-2.

On November 18, 2009, Judge Tsoodle-Marcus entered written findings and conclusions

that allowed counsel to enter his appearance and denied the other demands because they "were

made seven days after the Defendant was found guilty and subsequently sentenced."  *Doc. 1-1* at

2.  That same day, counsel filed a document demanding Petitioner's release on the ground that

although he had been advised of his right to a trial by jury, the Modern Court "had no intention

of ever granting . . . a jury trial, even if one had been demanded."  *Doc. 1-9* at 1.  Petitioner relies

on the observation that in the past, no jury trial had ever been conducted or granted.  *Id.* at 1-4.

Judge Tsoodle-Marcus held a hearing on the affidavit and demand for release.  It was

recorded but not transcribed, and Respondents submitted the audio version for the federal record

and it is difficult to follow.  However, two things were made clear by the discussion at this

hearing.  First, *Red Elk* does not stand for the proposition that tribal members may not be jailed

unless tried by a jury.  Instead, *Red Elk* involved a ***failure to inform*** a tribal defendant of his

right to a jury trial.  That is consistent with how *Poodry* characterized *Red Elk,* the sole federal

decision I have found that even mentions *Red Elk,*[19] and with how counsel characterizes the

---

[19]  *See Poodry,* 85 F.3d at 892 ("*Red Elk v. Silk,* No. CV83-13-GF, 10 Indian L. Rptr. 3110 (D.
Mont. Apr. 6, 1983) (granting writ of habeas corpus where tribal court records did not reflect that

decision in the federal petition.[20]  Second, the issue was not whether Petitioner was advised of his right to a jury trial – his plea form shows that he was.  Likewise, the issue was not whether the tribe had a history of not providing jury trials.  Evidently, historically the Pueblo had not provided jury trials and only recently began advising criminal defendants of their right to one.  A report dated October 2009 provides a grim view of an underfunded court system, with inadequate, deteriorating and unsafe physical facilities, and nonexistent or inconsistently-followed procedures.  *See, e.g., Doc. 11-6* at 16-21.  Nevertheless, Judge Tsoodle-Marcus, rejected  counsel's argument that the tribe's past practices created a foregone conclusion that no jury trial would have been held had Petitioner asked for one.  She denied relief because Petitioner did not ask for a jury trial at a time when he could have been provided with one – he only demanded it through counsel after he had been sentenced.  In essence, she held that Petitioner waived his right to a jury trial.

Meanwhile, Petitioner had also applied to the Governors for release from custody.  That was the forum where he raised all of the issues presented in his federal petition.  His request was denied, though no written or other indication of the reasons for the decision are before this Court.  *See Doc. 1* at 5-6 ("The Governor and Lieutenant Governor [denied relief].  No written order was received [and] counsel is aware of no formal action . . . other than the oral denial in the tribal forum"); *see also Tsoodle-Marcus Affidavit,* ¶¶ 16-18; *Doc. 11-3* at 43-46; *Doc. 11-4* at 1-43; *Doc. 11-5* at 1-10.

---

petitioner was informed of right to jury trial)").

   [20]  *See Doc. 1* at 14 ("*Red  Elk* . . . requires trial courts to advise defendants of their right to a jury trial before they can be incarcerated.").  Petitioner did not attach a copy of the decision for this Court as asserted.  *See id.*  The decision is not available to the federal judiciary on Westlaw, from the district court that through PACER, or online without a subscription to the Indian Law Reporter.

### C. Claims Raised In Petition And Reply

Between his petition and reply (which asserts new claims), Petitioner raises a total of ten

claims.  I will present and discuss them in this order:

1. It is cruel and unusual punishment for Judge Tsoodle-Marcus to have incarcerated Petitioner in a non-tribal jail.  *Doc. 13* at 11-12.

2. Because Judge Tsoodle-Marcus is not a licensed attorney or member of the New Mexico Bar as required by the tribal rules, Petitioner was denied due process as guaranteed by § 1302(8).  *Id.* at 18.

3. Because petitioner's post-trial counsel was not provided with copies of the arraignment and trial proceedings, the tribal court denied petitioner's right to counsel guaranteed by § 1302(6).  *Doc. 1* at 16-17.

4. Because Judge Tsoodle-Marcus's affidavit gives reasons other than Officer Vasquez's probable cause statement as the basis for her decision, the post-hoc justifications violate procedural due process.  *Doc. 13* at 8.

5. Because his parents were forbidden from attending Petitioner's arraignment and trial, Petitioner was denied his right to a "public" trial guaranteed by § 1302(6).  *Doc. 1* at 6-9.

6. Because the Taos Pueblo Tribal Court does not have the facilities to hold a jury trial, the right to a jury trial guaranteed by § 1302(10) and advised of during arraignment is illusory.  *Id.* at 13-16.

7. Because Judge Tsoodle-Marcus questioned Petitioner during the bench trial, she acted as "prosecutor" and violated his right to procedural due process. *Doc. 13* at 5.

8. Because Judge Tsoodle-Marcus questioned Petitioner during the bench trial, the trial was "fundamentally unfair" and deprived Petitioner of due process. *Id.* at 5-6.

9. Because Judge Tsoodle-Marcus questioned Petitioner during the bench trial, she violated his right not to be compelled as a witness guaranteed by § 1302(4).  *Id.* at 11-13.

10. Because Judge Tsoodle-Marcus convicted Petitioner based on Officer Vasquez's "probable cause statement" and Petitioner's "hearsay" statement to his father, Petitioner was denied the right to confront witnesses guaranteed by § 1302(6).  *Doc. 1* at 9-11.

### D.  Noncognizable Claims

Notwithstanding the invocation of constitutional verbiage, Petitioner's first four claims do not give rise to any cognizable basis for federal habeas relief and can be summarily dismissed.

**Sentencing Facility.**  It is long- and well-established that there is no constitutional right to be held in any particular facility.  *E.g., Olim  v. Wakinekona,* 461 U.S. 238, 247-48 (1983); *Moody v. Daggett,* 429 U.S. 78, 88, n. 9 (1976); *Meachum  v. Fano,* 427 U.S. 215, 223-25 (1976); *Rael v. Williams,* 223 F.3d 1153, 1154 (10th Cir. 2000); *Montez v. McKinna,* 208 F.3d 862, 864-66 & n.4 (10th Cir. 2000).

**Only Constitutional Claims Are Cognizable In Habeas Corpus.**  The fact that a tribal rule of procedure requires tribal judges be licensed attorneys and members of the New Mexico Bar is not grounds for habeas relief.  It is equally well- and long-established that only matters of constitutional dimension will give rise to federal habeas relief.[21]  Petitioner has not cited, nor have I found, any federal qualification requirements for state or tribal judges, much less a federal rule of constitutional dimension that requires they be licensed attorneys.

In addition, there is no allegation whatsoever of an improper pecuniary interest in the outcome of the proceedings on the part of Judge Tsoodle-Marcus that would rise to the level of a due process violation.[22]  The audio of the trial and post-trial proceedings reveal that Judge

---

[21]  *E.g., Denney v. Roberts,* 196 Fed. App'x 713 (10th Cir. 2006) ("Mr. Denney's first three claims challenge the interpretation of state law by state courts.  Such claims are not cognizable on federal habeas review, for 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.') (quoting *Estelle v. McGuire,* 502 U.S. 62, 67-68, 112 (1991)).

[22]  *E.g., Tuney v. State of Ohio,* 273 U.S. 510, 523 (1927) ("All questions of judicial qualification may not involve constitutional validity.  Thus matters of kinship, personal bias, state policy, remoteness of interest would seem generally to be matters merely of legislative discretion. . . .  But it certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to

Tsoodle-Marcus at times can be somewhat curt and impatient, and that she and counsel for

Petitioner have diametrically opposed views on whether the Pueblo court system is operating

properly.  However, neither the way the judge comported herself in the proceedings, nor the

conclusory accusations of bias by Petitioner's mother, rise to the "most extreme of cases [where]

disqualification on [a bias or prejudice] basis be constitutionally required."  *Aetna Life Ins. Co. v.*

*Lavoie,* 475 U.S. 813, 821 (1986); *see also Mother's Affidavit,* ¶¶ 12-15 ("There are many

people on the Pueblo who are sick of getting  pushed around by this Judge, having their families

torn apart based on bias instead of law.  . . .  Accordingly, since this all happened, I have been

assisting with getting signatures on a petition to have her removed from the bench. . . .  She

called my work . . . and she told my employer that I was doing this.").  Disagreement with how a

judge conducts proceedings and makes rulings is not sufficient to require recusal, much less

warrant habeas relief.

> "[J]udicial rulings alone almost never constitute a valid basis for a bias or
> partiality motion. . . .  [They] can only in the rarest circumstances evidence the
> degree of favoritism or antagonism required" for recusal.  *Liteky v. United States,*
> 510 U.S. 540, 555 (1994).  And "[a] judge's ordinary efforts at courtroom
> administration - even a stern and short-tempered judge's ordinary efforts at
> courtroom administration - remain immune."  *Id.* at 556.  "[E]xpressions of
> impatience, dissatisfaction, annoyance, and even anger, that are within the bounds
> of what imperfect men and women, even after having been confirmed as federal
> judges, sometimes display" do not support a bias challenge "unless they display a
> deep-seated favoritism or antagonism that would make fair judgment impossible."
> *Id.* at 555-56.

*United States v. Erickson,* 561 F.3d 1150, 1169 (10th Cir. 2009).

---

subject his liberty or property to the judgment of a court, the judge of which has a direct, personal,
substantial pecuniary interest in reaching a conclusion against him in his case.  The mayor of the village
of North College Hill, Ohio, has a direct personal pecuniary interest in convicting the defendant who
came before him for trial, in the $12 of costs imposed in his behalf, which he would not have received if
the defendant had been acquitted.").

**Timely Production Of Transcript For Postconviction Purposes.**  Petitioner retained his attorneys after trial "for the purpose of post-trial motions." *Doc. 1* at 16.  He argues that because his attorneys were not given transcripts of his arraignment and trial immediately upon their request, he was denied "effective assistance" of counsel in the tribal postconviction proceedings. *See Doc. 1* at 17.  Judge Tsoodle-Marcus maintains her denial of the request was an "oversight" and not a "deliberate denial." *Tsoodle-Marcus Affidavit,* ¶ 23; *see also Doc. 11-11* at Exh. 5 (affidavit of court clerk, further explaining the confusion).

I agree that "[t]ribal members subject to prosecution should not have to file a federal petition in order to get access to materials for their counsel." *Doc. 13* at 7.  Nevertheless, while Petitioner asserts Judge Tsoodle-Marcus's actions "constitute[] a deliberate disadvantaging of his defense, which includes the filing of postconviction motion," he does not explain how he was harmed.  *Id.*  Indeed, the record establishes that Petitioner suffered no disadvantage.  He was able to raise postconviction claims without the records.  In the absence of court records, he could have supported his factual assertions with affidavits.  More fundamentally, except for the jury trial claim, the bulk of the claims for which counsel ostensibly needed the audiotapes were not raised until the gubernatorial level.  That forum is one that Petitioner admits is "exclusively via a traditional forum" where "counsel is not permitted." *Doc. 1* at 5-6.  As in other habeas proceedings, there can be no relief for a denial of effective assistance of counsel in a forum where counsel is not constitutionally required.[23]

---

[23] *E.g., Alexander v. Mullarkey,* 340 Fed. App'x 455, 456 (10th Cir. 2009) ("it is well settled that there is no constitutional or other federal right to the assistance of counsel in postconviction  proceedings. *See Pennsylvania v. Finley,* 481 U.S. 551, 555 (1987) ([T]he right to appointed counsel extends to the first appeal of right, and no further.').  'States have no obligation to provide [postconviction] relief, and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well.' *Id.*"); *Farner v. Workman,* 302 Fed. App'x 762, 765 (10th Cir. 2008) ("to the extent that Mr. Farner may be arguing that he is entitled to the relief sought on the ground of

***Petitioner Is Not Raising An Insufficiency Claim.***   Again with no citation to authority

or citation to the offending portions of Respondents' answer, Petitioner claims that in the

> Order of Judgement, [Judge Tsoodle-Marcus] stated [that Petitioner] was
> convicted pursuant to the Probable Cause statement against him.  Now, the Tribal
> Court has alleged other reasons for his conviction and sentence.  This is  violation
> of [Petitioner's] right to procedural due process, as Respondents['] new
> justifications create a moving target that makes it impossible to properly litigate,
> defend, or draft post-trial motions or federal petitions.  It also violates
> [Petitioner's] right to assistance of counsel, because the right entails *effective*
> assistance, and the Tribal Court's practice of doing nothing and upon compulsion
> the bare minimum (sic), and changing justifications at every turn, inherently
> precludes effective representation.

*Doc. 13* at 8 (emphasis original).  For the same reasons accompanying footnote 23,

ineffectiveness of counsel in a postconviction proceeding is not cognizable in habeas.  The

procedural due process argument is patently frivolous – one of the hallmarks of litigation is

responding to opposing arguments.  Finally, counsel has not raised a sufficiency of the evidence

claim in the federal petition.  Even if counsel had, Judge Tsoodle-Marcus's reasons for her

finding of guilt do not control the federal habeas inquiry.  Rather, it is the ***evidence*** that is

material to that resolution.  *See e.g., McDaniel v. Brown,* ___ U.S. ___, ___, 130 S. Ct. 665, 673

(2010) ("*Jackson* requires a reviewing court to review the evidence 'in the light most favorable

to the prosecution.' . . .  Expressed more fully, this means a reviewing court 'faced with a record

of historical facts that supports conflicting inferences must presume - even if it does not

affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of

the prosecution, and must defer to that resolution.' . . . 'The *Jackson* standard ... looks to whether

---

ineffectiveness of counsel, we note that he had no constitutional right to effective assistance of counsel in
his § 2254 proceeding.  *See Coleman v. Thompson,* 501 U.S. 722, 752 (1991) (no constitutional right to
counsel in state postconviction proceedings); *Coronado v. Ward,* 517 F.3d 1212, 1218 (10th Cir. 2008)
(no constitutional right to counsel in § 2254 proceedings).").

there is sufficient evidence which, if credited, could support the conviction'") (quoting *Jackson v. Virginia,* 443 U.S. 307, 366 (1979) and *Schlup v. Delo,* 513 U.S. 298, 330 (1995)).

### E.  The "Trial" Claims

**Right To Public Trial.**  This claim fails for a number of reasons.  Whatever rights the parents may have to a public trial under the ICRA cannot be redressed here because they are not under "detention."  They have no standing to raise Petitioner's right to a public trial.  While Petitioner has standing to raise the right, he had to invoke the right first.  He waived it however, by making no objection to how his trial was conducted and by not asking that his father be present during his trial.[24]

Moreover, nothing in the record establishes that the trial was actually "*closed*" to the public.  Even if I construe the affidavits of Petitioner's parents broadly and credit them, they do not assert or establish that the trial proceedings were closed to the public.  The Mother's affidavit does not say that she desired to attend the trial or made any attempt to do so.  The Father's affidavit provides that he *interpreted* Judge Tsoodle-Marcus's comment during arraignment as forbidding him attending the trial.  On the other hand, nothing in his affidavit provides that he

---

[24]  *E.g.,  Presley v. Georgia,* ___ U.S. ___, ___ 130 S. Ct. 721, 72-24 (2010) ("This Court's rulings with respect to the public trial right rest upon two different provisions of the Bill of Rights, . . . [the First Amendment and this] case now before the Court is brought under the Sixth Amendment, for it is the ***accused who invoked*** his right to a public trial . . .  the accused does have a right to insist that the voir dire of the jurors be public") (emphasis added; case where defendant's uncle was asked to leave the courtroom so potential jurors could be seated in courtroom and defendant objected); *Waller v. Georgia,* 467 U.S. 39, 44 (1984) ("accused's right under the Sixth Amendment ***to insist upon*** a public trial") (emphasis added; state moved to close suppression hearing concerning wiretaps and defendant objected); *see also e.g., Peretz v. United States,* 501 U.S. 923, 936-37 (1991) ("The most basic rights of criminal defendants are similarly subject to waiver. . . . failure to object to closing of courtroom is waiver of right to public trial . . . the Constitution affords no protection to a defendant who waives these fundamental rights"); *Society of Professional Journalists v. Secretary of Labor,* 616 F. Supp. 569, 572 (D. Utah 1985) ("The sixth amendment gives only the defendant the right to a public trial; it does not give anyone other than a criminal defendant standing to assert the right.").

desired to attend the trial or made any attempt to do so.  The record reflects why the Father's affidavit would not make any such assertions – his son went to trial prepared to change his plea and argued for dismissal when the opportunity to do so presented itself.  And, Petitioner's father was a potential witness against him.  Finally, although the Father's affidavit states that "[a]s far as [he] could tell . . . no other members of the public went into the courthouse for my son's trial, *Father's Affidavit,* ¶ 10, I have found no decision that holds if the public declines to attend a trial, then the proceedings is deemed "closed" for federal constitutional purposes.[25]

**Facilities For A Jury Trial/Past Jury Trials.**  Petitioner claims that the Taos Pueblo is not equipped to hold a jury trial and has never held one.  He maintains that the lack of jury trials is so well-known throughout tribal members that any guarantee of one is illusory, and thereby excuses Petitioner for not asking for a jury trial instead of agreeing to a bench trial.  Confusing the concepts of exhaustion, waiver, and procedural default,[26] Respondents argue that the claim is

---

[25]  *See, e.g., United States v. Villagomez,* ___ F. Supp. 2d ___, ___, 2010 WL 1726147 at *17 (D. N. Mar. I. 4/22/10) (rejecting argument that refusal to allow general public to use unoccupied reserved seats constituted a "closure" of the courtroom because "the 'closure' of a trial, is the exclusion of all members of the general public, the defendant's family, and the press.  Indeed, that is what the Supreme Court described as a 'closure,' not only in *Waller,* but in *Presley*"); *id.* at * 21 (to define "closure" any differently would "result in a wholesale reversal or rejection of decades of Supreme Court and lower federal court precedent on the meaning of "closure" of a trial.  It would also expand the scope of the Sixth Amendment right to a public trial far beyond any existing federal court holding.  It is one thing for a party to argue a novel question, but another thing entirely to stretch a constitutional provision so far beyond its scope under existing precedent.").

[26]  An unexhausted claim can be procedurally defaulted in some circumstances, but there is no dispute that the jury trial claim was presented to the tribal courts in postconviction proceedings, both before Judge Tsoodle-Marcus and the governors.  *E.g., Duty v. Workman,* 2010 WL 533117 at * 11 (10th Cir. 2010) ("Duty concedes he did not present this claim to the state courts.  Generally, we would dismiss this unexhausted  claim without prejudice to allow him to return to state court. . . .  However, if the court to which Duty must present his claims in order to meet the exhaustion requirement would now find those claims procedurally barred, there is a procedural default for the purposes of federal habeas review. . .  In this case, if Duty were to return to state court to exhaust this claim, the Oklahoma courts would undoubtedly determine the claim was procedurally barred . . .  Thus, our review is precluded unless he demonstrates cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice.")

"procedurally defaulted" because Petitioner did not request a jury trial until after he was

sentenced. *See Doc. 11* at 17-23. However, they cite no tribal rule or statute that was defaulted

and relied upon by tribal authorities.[27]

Nonetheless, I agree that fact that a trial has never been held is not material in this

particular case and, as with the "public" trial, the issue is one of waiver.[28] A right to trial by jury

may be waived and "whether or not there is an intelligent, competent, self-protecting waiver of

jury trial by an accused must depend upon the unique circumstances of each case." *Adams v.*

*U.S. ex rel. McCann,* 317 U.S. 269, 277 (1942). For obvious reasons, the experience in most

federal courts is that the better practice is for a judge to engage in some form of jury trial waiver

colloquy. But, an on-the-record colloquy is not constitutionally required to find that the right

---

(internal quotations, citations, and editorial changes in brackets omitted) (citing *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1 (1992), *Bland v. Sirmons,* 459 F.3d 999, 1012 (10th Cir. 2006), and Oklahoma statute); *Berg v. Foster,* 244 Fed. App'x 239, 247 (10th Cir. 2007) ("Because claims one and two were exhausted in the state courts, the procedural bar applied by the district court is inapplicable to these claims and the claims must be addressed on the merits.").

[27] An example of a procedural rule is FED. R. CIV. P. 38(d), which provides that a " party waives a jury trial unless its demand is properly served and filed." Another is FED. R. CRIM. P. 23(a)(1), which provides that "the trial must be by jury unless . . . the defendant waives a jury trial in writing . . . the government consents . . . and the court approves." Exhausted claims can be procedurally defaulted if a tribal court relies on a tribal rule to enforce default and, because of the default, declines to address the claim. That is not the end of the federal habeas procedural default analysis, however. *E.g., Sandoval v. Ulibarri,* 548 F.3d 902, 912 (10th Cir. 2008) ("On direct appeal, the New Mexico Court of Appeals held that the trial judge had not abused his discretion in admitting the testimony because Sandoval's counsel had stipulated to the reasonableness of the state's efforts to serve Parra, the only predicate for admission of the testimony that had been challenged. Although the state court did not mention the doctrine of invited error, its holding seems clearly to be an application of that principle. The Confrontation Clause claim was thus waived . . . in the state court. We do not consider issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice.") (internal quotations and citation to *Hickman v. Spears,* 160 F.3d 1269, 1271 (10th Cir.1998) omitted).

[28] *E.g., United States v. Olano,* 507 U.S. 725, 733 (1993) ("Waiver  is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (internal quotations and citations omitted).

was knowingly and intelligently waived.[29]  In the Seventh Amendment context, conduct is key in finding waiver and if a person participates in a bench trial without objection, they will be found to have waived the right to have a jury trial.[30]  In other words, conduct can evince assent.  I find no reason to reach a different conclusion here.  There is no assertion, much less one supported by affidavit or the record, that Petitioner failed to understand that he had a right to a jury trial, wanted a jury trial, or in any way intended to invoke that right.  Furthermore, this is not a situation where Petitioner chose to plead guilty, thereby waiving his right to a trial altogether. He decided not to plead guilty as originally intended, and proceed with the bench trial. Accordingly, I find this claim affords no basis for habeas relief.

### F.  The Tribal Judge's Conduct During Trial

Three claims challenge how Judge Tsoodle-Marcus conducted the trial.  One asserts that by "questioning" Petitioner, she assumed the role of the "prosecutor" thereby violating

---

[29]  See the discussion in *United States v. Carmenate,* 544 F.3d 105, 107-10 (2nd Cir. 2008) (and cases cited therein); *see also, e.g., Carter v. Newkirk,* 6 Fed. App'x 461, 463 (7th Cir. 2001) ("The Sixth Amendment guarantees an accused the right to trial by jury. . . .  A criminal defendant, however, may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution . . . including the right to a jury trial . . . .  Generally, the waiver of a constitutional right will be knowing and voluntary if the defendant knew about the right in question and the possible consequences of deciding to forgo that right. . .  But the validity of a waiver turns on the unique circumstances of each case . . . and though the absence of an on-the-record colloquy between the trial judge and the defendant may be probative of whether a waiver is valid, we have made it clear that such an exchange is not constitutionally required") (internal citations to Supreme Court cases omitted);  *Marone v. United States,* 10 F.3d 65, 67 (2nd Cir. 1993) ("A court is not constitutionally required to conduct an on the record colloquy with a defendant prior to a waiver of the right to a jury trial.") (citing *United States v. Martin,* 704 F.2d 267, 274 (6th Cir. 1983) and *United States v. Scott,* 583 F.2d 362, 363-64 (7th Cir. 1978) (per curiam)).

[30]  *E.g., Palmer v. Valdez,* 560 F.3d 965, 968 (9th Cir. 2009) ("any party's "knowing participation in a bench trial without objection is sufficient to constitute a jury waiver.'") (quoting *White v. McGinnis,* 903 F.2d 699, 703 (9th Cir. 1990) (en banc)); *see generally* 9 C. Wright & A. Miller, FEDERAL PRACTICE AND PROCEDURE § 2321, at 102 (3rd ed., current through 2010 update) ("It long has been settled by an impressive array of precedents that the Seventh Amendment to the Constitution gives a right to jury trial in cases covered by its language but that this right, like other constitutional rights, can be waived by the parties by nonassertion. . . . The right to jury trial also may be waived as it has in many, many cases, by conduct, such as failing to object to or actually participating in a bench trial") (and cases cited therein).

procedural due process.  The transcript, however, shows that Officer Vasquez was serving in that

capacity, albeit not as an attorney.  For example, after Officer Vasquez and Petitioner told the

court what each wanted, Judge Tsoodle-Marcus said, "Okay.  Prosecution.  All right

prosecution?  What you want to do is set the foundation which is the facts of the case," and

Officer Vasquez commenced his testimony.  *See Doc. 11-7* at 4.

Petitioner's also contends that Judge Tsoodle-Marcus questions to Petitioner were the

were "fundamentally unfair"and violated his right not to be compelled to give testimony against

himself.  Aside from inquiring if Petitioner wanted to plead or go to trial, and prompting the

parties for introductory remarks concerning what they wanted the court to do, her involvement

with "questioning" Petitioner essentially involved one statement and three questions.  After

telling Officer Vasquez he could be seated following his testimony, she said:  "Martin?  Go

ahead and rebuttal."  *Doc. 11-7* at 4.  When he finished his statement she asked Petitioner:  "are

you finished?"  *Id.* at 5.  She then asked Officer Vasquez and Petitioner if they "had "any further

questions."  *Id.*  She then gave Petitioner the opportunity to respond to the Officer's assertion

about what he overheard Petitioner saying to his father – after recounting that portion of the

statement of probable cause, she said:  "[s]o, how do you respond to that."  *Id.*

It is true that "[i]n a criminal trial, the indicted defendant has an unqualified right to

refuse to testify and may not be punished for invoking that right."  *Hiibel v. Sixth Judicial Dist.*

*Court of Nevada, Humboldt County,* 542 U.S. 177, 193 (2004) (Stevens, J., dissenting) (citing

*Carter v. Kentucky,* 450 U.S. 288 299-300 (1981)).  But the right is waived if it is not invoked –

"'The Amendment speaks of compulsion.  It does not preclude a witness from testifying

voluntarily in matters which may incriminate him.  If, therefore, he desires the protection of the

privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment.'" *Garner v. United States,* 424 U.S. 648, 654-55 (1976) (quoting *United States v. Monia,* 317 U.S. 424, 427 (1943)).   The decision to defend oneself at trial is not "compulsion" under the Fifth Amendment, even if it is hard choice for a defendant to make.

> we do not think that respondent's testimony at a clemency interview would be "compelled" within the meaning of the Fifth Amendment.  It is difficult to see how a voluntary interview could "compel" respondent to speak.  He merely faces a choice quite similar to the sorts of choices that a criminal defendant must make in the course of criminal proceedings, none of which has ever been held to violate the Fifth Amendment.
>
> Long ago we held that a defendant who took the stand in his own defense could not claim the privilege against self-incrimination when the prosecution sought to cross-examine him. . . .  A defendant who takes the stand in his own behalf may be impeached by proof of prior convictions without violation of the Fifth Amendment privilege. . . .  A defendant whose motion for acquittal at the close of the government's case is denied must then elect whether to stand on his motion or to put on a defense, with the accompanying risk that in doing so he will augment the government's case against him. . . .  In each of these situations, there are undoubted pressures-generated by the strength of the government's case against him-pushing the criminal defendant to testify.  But it has never been suggested that such pressures constitute "compulsion" for Fifth Amendment purposes.

*Ohio Adult Parole Authority v. Woodard,* 523 U.S. 272, 286-88 (1998).[31]

Moreover, Petitioner has not cited any decision that prohibits a trial judge who is

---

[31]  *See also e.g., McKune v. Lile,* 536 U.S. 24, 41 (2002) ("Prison context or not, respondent's choice is marked less by compulsion than by choices the Court has held give no rise to a self-incrimination claim. The 'criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow.  Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.'") (quoting *McGautha v. California,* 402 U.S. 183, 213 (1971)); *United States v. Constantine,* 263 F.3d 1122, 1129 n. 4 (10th Cir. 2001) ("Although we find Mr. Constantine's Fifth Amendment rights were not violated, in addition he arguably waived his right to silence regarding the further details of that burglary.  'It is well established that a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details.'  . . . A defendant witness 'determines the area of disclosure and therefore of inquiry,' and thus '[t]he privilege is waived for the matters to which the witness testifies.'") (quoting *Mitchell v. United States,* 526 U.S. 314, 321 (1999)).

conducting a bench trial from asking questions.  "Due process" does not dictate any particular

manner in conducting criminal proceedings.

> Cases in this Court have long proceeded on the premise that the Due Process
> Clause guarantees the fundamental elements of fairness in a criminal trial. . . .
> But it has never been thought that such cases establish this Court as a rule-making
> organ for the promulgation of state rules of criminal procedure.  And none of the
> specific provisions of the Constitution ordains this Court with such authority. . . .
> As Mr. Justice Cardozo had occasion to remark, a state rule of law "does not run
> foul of the Fourteenth Amendment because another method may seem to our
> thinking to be fairer or wiser or to give a surer promise of protection to the
> prisoner at bar."

*Spencer v. State of Texas,* 385 U.S. 554, 563-64 (1967).  Due process" only requires that

proceedings be "fundamentally fair."  And, to establish that a proceeding was fundamentally

unfair requires that Petitioner, at the very least, show the alleged errors impacted the

proceedings.  *E.g., Lisenba v. People of State of California,* 314 U.S. 219, 236 ("As applied to a

criminal trial, denial of due process is the failure to observe that fundamental fairness essential to

the very concept of justice.  In order to declare a denial of it we must find that the absence of that

fairness fatally infected the trial; the acts complained of must be of such quality as necessarily

prevents a fair trial.").  Furthermore,  because "a fundamental-fairness analysis is not subject to

clearly definable legal elements, when engaged in such an endeavor a federal court must tread

gingerly and exercise considerable self-restraint."  *Spears v. Mullin,* 343 F.3d 1215, 1226 (10th

Cir. 2003) (internal quotations and citations omitted), *cert. denied sub nom,* 541 U.S. 909 (2004).

In a bench trial where a defendant is proceeding *pro se* and there is no equivalent to a

district attorney, someone has to say something to shepherd the proceedings along, and it makes

sense for the judge to do so.  That is precisely what Judge Tsoodle-Marcus did here, outlining for

both parties the overview of the proceedings and prompting them to make sure the record was

complete.  I cannot conclude there is any likelihood that the result of the trial would have been

different if someone other than Judg Tsoodle-Marcus had asked the questions of Petitioner and Officer Vasquez.  The trial was a bench trial and the judge was the fact finder.  The evidence of guilt consisted solely of the officer's observations vs. the defendant's denial – a classic credibility call for the trier of fact to make.  Judge Tsoodle-Marcus credited the officer.  This was a perfectly reasonable conclusion supported by sufficient evidence, given that Officer Vasquez observed Petitioner driving a wrecked car, smelled alcohol on Petitioner's breath, and could not gather physical evidence to confirm or deny just how intoxicated Petitioner was because of Petitioner's own actions.

### G. Confrontation Clause Is Not Applicable

Finally, Petitioner argues that because Judge Tsoodle-Marcus convicted him based on Officer Vasquez's "probable cause statement" and Petitioner's "hearsay" statement to his father, Petitioner was denied the right to confront the witnesses against him.  However, Officer Vasquez gave his testimony live at trial and that testimony happened to be consistent with his "probable cause statement."  The alleged "hearsay" statement is  Petitioner's own statement – which makes it nonhearsay.  See FED. R. EVID. 801(d)(2)(A) ("A statement is not hearsay if [it] is offered against a party and is . . . the party's own statement").  Nor does the questioning initiated by Petitioner's father, which elicited the response overheard by the officer, make the father's question or Petitioner's own statement "testimonial."  As such, the Confrontation Clause is not applicable.[32]

---

[32] *E.g., Davis v.Washington,* 547 U.S. 813, 825-30 (2006) (statement must be "testimonial" in nature; statements given under "official interrogation" are inherently testimonial); *Crawford v. Washington,* 541 U.S. 36, 51 (2004)  ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.  The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement."); *United States v. Smalls,* ___ F.3d ___, 2010 WL 1745123 at * 9  (10th Cir. 2010) ("Synthesizing *Crawford* and *Davis,* we might today

Wherefore,

**IT IS HEREBY RECOMMENDED** that the § 1303 petition be denied and this action dismissed with prejudice.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

_____
UNITED STATES MAGISTRATE JUDGE

---

formulate a definition of a testimonial statement which reads: a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution. . . .  In *Davis,* the Court expressed the view that "statements made unwittingly to a Government informant" or "statements from one prisoner to another" are "clearly nontestimonial." "); *Torres v. Roberts,* 253 Fed. App'x 783, 787-88 (10th Cir. 2007) ("We agree that no clear authority exists for the proposition that the Sixth Amendment guarantees a right to "confront oneself" at trial. . . . *4 Jack B. Weinstein & Margaret A. Berger,* WEINSTEIN'S FEDERAL EVIDENCE § 802.05[3][d] at 802-25 (2d ed.2005) (explaining 'a party cannot seriously claim that his or her own statement should be excluded because it was not made under oath or subject to cross-examination').") (other citations omitted).